**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

LANDMARK AMERICAN INSURANCE
COMPANY,                                             :

      Plaintiff,                              :          Civil Action No. 08-1250 (FLW)

      v.                                           :

                                     **OPINION**

RIDER UNIVERSITY, et al.,                    :

      Defendants.                          :
_____

**WOLFSON, United States District Judge:**

Presently before the Court is a motion by Defendants, Rider University ("Rider") and its insurer United Educators, a Risk Retention Group ("UE"), (collectively "Moving Defendants"), for summary judgment on Plaintiff, Landmark American Insurance Company's ("Plaintiff" or "Landmark"), Complaint.  This suit arises out of the death of a Rider student, Gary DeVercelly, Jr. ("DeVercelly"), who died in March 2007, allegedly as a result of acute alcohol poisoning he suffered at a "Big/Little" Night pledging event held by the Rider Chapter of the Phi Kappa Tau Fraternity ("PKT" or "Fraternity").  A lawsuit captioned DeVercelly v. Rider University, et al., was filed against the Fraternity, several of its members, Rider, and certain Rider employees in the Superior Court of New Jersey, Mercer County Law Division (the "DeVercelly Action").  Landmark seeks a declaration that it, as the insurer of PKT and the PKT Chapter at Rider ("Chapter"), does not owe a defense obligation to Rider and additional DeVercelly Action defendants, namely, Adriano DiDonato ("DiDonato"), Ada Badgely ("Badgely"), Cassie Iacovelli ("Iacovelli"), and Michael Torney ("Torney").[1]  Plaintiff filed opposition to the motion

_____

[1]Although Plaintiff names Torney in this action, it fails to move with respect to this defendant, as well as other members of the Chapter, including Defendants Vincent Cagulero, Devin Marcus,

and cross-moved for partial summary judgment seeking a declaration that (1) Ohio law applies

in this case and (2) it has no duty to defend.  For the reasons that follow, Plaintiff's Cross-

Motion for Partial Summary Judgment is granted in part and denied in part and Moving

Defendants' Motion for Summary Judgment is granted in part and denied in part as follows: (1)

the Court shall apply New Jersey law to the Landmark Policy; (2) Landmark has a duty to

defend Moving Defendants, including Rider and its employees, for all claims; (3) Landmark

does not have a duty to defend DiDonato in his capacity as a Chapter member in connection with

any claims in the <u>DeVercelly</u> Action arising out of hazing based on the Landmark Policy's

hazing exclusion; and (4) Torney, who was not named in this Motion, has twenty days to inform

the Court of his position.

I.      **BACKGROUND AND PROCEDURAL HISTORY**

On March 12, 2008, Landmark filed this action seeking Declaratory Judgment that it

does not owe a duty to defend Defendants in the <u>DeVercelly</u> Action pending in state court.  On

April 23, 2009, Plaintiff filed a Third Amended Complaint ("Complaint").  The following

version of events is not disputed unless otherwise noted.

A.      **The Parties to this Action**

By way of background, the Court will briefly identify the moving parties.  Plaintiff

Landmark is an Oklahoma corporation with its principal place of business in Atlanta, Georgia.

Pl. Compl. ¶ 3.  Defendant Rider University is a non-profit corporation organized in New Jersey

with its principal place of business in Lawrenceville, New Jersey.  UE Ans. ¶ 4.  Defendant UE

is a "risk retention group organized and existing under the laws of Vermont" with its principal

_____

Dominic Olsen, and Clinton Main, all Chapter members at Rider.  Therefore, as discussed
herein, the Court's holding does not completely foreclose Torney's, or the other Chapter
members, rights vis a vis Landmark at this time.  <u>See</u> Part III C (d).

place of business in Chevy Chase, Maryland.  UE Ans. ¶ 13.  Defendant DiDonato, a Chapter member, was employed by Rider as the 'House Manager' for PKT's fraternity house on the Rider campus.  Df. Facts, Ex. 6 ("DeVercelly Compl.") ¶ 6. Defendant Badgely and Iacovelli were both employees of Rider "with responsibilities for managing and supervising the fraternities on campus."  Pl. Facts ¶¶ 32, 33.  Torney was the President of the Chapter who allegedly "authorized, directed and/or participated in one or more of the hazing events and/or the aftermath."  Pl. Facts ¶ 31.

> **B.      The DeVercelly Action**

The DeVercelly Action is a wrongful death and survivorship lawsuit against PKT, several Chapter members, Rider, and certain Rider employees pending in the Superior Court of New Jersey, Mercer County, Law Division.  DeVercelly allegedly consumed alcohol at a Chapter fraternity pledging event held at the Chapter's student housing facility owned by Rider and occupied by Chapter members.  See Df. Facts, Ex. 6, ¶¶ 76-77, 83.  The DeVercelly Complaint[2] alleges that Rider actively supported fraternities and fraternity activities on its campus and that the fraternities, including PKT, operated student housing facilities which were owned by and under the supervision of Rider.  Id. ¶ 5.  The Chapter was governed by PKT rules and regulations and was operated for and on behalf of PKT.  Id. ¶¶ 47, 49.  DeVercelly, as a pledge of PKT, was allegedly required to attend several events conducted by and for the benefit of PKT through its Chapter.  Id. ¶ 9.  On the night DeVercelly consumed the alcohol that led to his death, the Chapter was allegedly holding its traditional recruitment and pledge event known as "Big/Little" night during which DeVercelly, together with his Chapter Big Brother, drank from a bottle of Absolut Vodka provided by Chapter members.  Id. ¶¶ 11, 80, 82-83.  Thereafter,

---

[2] The Court takes judicial notice of the complaint filed in state court.  See Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004).

3

DeVercelly became ill and was allegedly taken to the second floor of the Chapter house where Chapter members attempted to induce him to vomit.  Id. ¶¶ 14, 87-92.  According to the DeVercelly Complaint, the "house manager, and [Chapter] officers and members, designated by and following National PKT risk and crisis management policies, placed themselves and others in positions to control the crisis and make life and death decisions about [DeVercelly]."  Id. ¶ 17.[3]  After several hours, emergency medical assistance was called to the Chapter house and DeVercelly was taken to the hospital where he died.  Id. ¶¶ 20-24.

In the DeVercelly Action, PKT was sued for: (1) its gross negligence and/or its management of the Rider Chapter house (Count V); (2) respondeat superior liability for its fraternity members (Count VI); (3) negligence per se in violating the New Jersey Anti-Hazing Statute (Count VII); (4) negligence per se in serving alcohol to a minor (Count VIII); (5) negligence in its organization, promotion, facilitation, and/or participation in the hazing conduct and underage drinking activities (Count IX); (6) negligence and violation of assumed duty to reasonably care for DeVercelly (Count X); and (7) negligence and violation of duty to prevent harm to DeVercelly (Count XI).  Id. ¶¶ 190-251.  Rider was sued for: (1) gross negligence and reckless misconduct in its management of the Chapter house, fraternities and its students (Count I); (2) gross negligence and reckless hiring, retention and supervision of its employees and students (Count II); (3) premises liability for its gross neglect of its students (Count III); (4) respondeat superior liability for the Chapter House Manager's gross negligence and reckless

---

[3] Landmark asserts that every year PKT provides a copy of an up to date Risk Management Policy to the president of each of its chapters, including the President of the Chapter at Rider. Hartman Decl. ¶ 6.  All PKT members, including those at Rider, are required to participate in a presentation on its policy in October of each year.  Id.  In addition, each new member of a chapter of PKT, including those at Rider, is required to sign an acknowledgment that the new member read and agreed to the Risk Management Policy when he first joins the Chapter.  Id. ¶ 7.

4

misconduct (Count IV); and (4) aiding and abetting PKT and the Chapter's misconduct (Count

V). Id. ¶¶ 115-200.

     C.     **Landmark Policy's Terms and Conditions**

     The parties dispute whether PKT is a national fraternity organization comprised of a

number of chapters across the country, Df. Facts ¶ 6; Df. Response ¶ 1, or if the local chapters

are merely associated with PKT, a separate organization.  Pl. Facts ¶ 6; Pl. Response ¶ 1.

Landmark issued PKT a commercial general liability policy, Policy No. LHA101733 (the

"Landmark Policy"), effective for the period October 1, 2006 to October 1, 2007, which had a

limit of liability in the amount of $1,000,000 per occurrence to PKT.  Dupre Decl. Ex. A-C.[4]

The Landmark Policy is subject to a self-insured retention of $2,500, but UE disputes that the

Landmark Policy is subject to an additional self-insured retention of $75,000 for a total self-

insured retention of $77,500.  Id.[5]  The Landmark Policy lists PKT as the Named Insured,

provides a business description for PKT as "National Fraternities," its "operations" are rated as

its various constituent "Fraternities," and the premium basis is calculated based upon the number

of Fraternities across the country, "per member." Dupre Decl., Ex. A. The Landmark Policy,

Endorsement No. 04, provides that a $2 million aggregate limit of liability applies "per location"

and is "defined by under-graduate chapter or colony chartered or recognized by the Named

---

[4]The parties also dispute the location where the Landmark Policy was negotiated and contracted.
Landmark asserts that the policy was negotiated for and issued to PKT in Oxford, Ohio.  Ex. A;
Renewal Cert.  However, UE avers that PKT's insurance broker, Swett & Crawford, is located in
Chicago, Illinois, and is the location where the Landmark Policy was negotiated and the
insurance binder was issued to PKT.  Dupre Decl., Ex. C (The Landmark Policy binder was
transmitted from RSUI Group, Inc. located in Atlanta, Georgia to Chicago, Illinois).

[5]The parties further dispute whether Landmark has the right, but not the duty, to assume control
of the defense of a claim where, as in the DeVercelly Action, liability is reasonably expected to
exceed the self-insured retentions.

Insured."  Id.[6]

Rider requires campus fraternity chapters to procure general liability insurance for at
least $1,000,000 that names Rider as an additional insured.  Df. Facts, Ex. 1, Ada Badgely Decl.
("Badgely Decl.") ¶¶ 6-7; Ex. 2, Elaine Rafferty Decl. ("Rafferty Decl.") ¶¶ 4-5; Dupre Decl.,
Ex. E, Letter from R. Leff to P. Freed, dated Nov. 5, 2007 ("Ex. E").  At the beginning of the
2006-07 school year, Rider issued a copy of the Greek Living Unit Policy to the Chapter, which
informed the Chapter of Rider's insurance requirement.  Badgely Decl. ¶¶ 7-9, Ex. A.  The
Landmark Policy includes a provision, entitled "Who Is An Insured," which states:

> Who is an insured of the Commercial General Liability Coverage Form is amended to
> include the following paragraph:
>
> Each of the following is an insured:
>
> A.    Fraternity chapters that are chartered and colonies that are recognized by
>       the Named Insured;
>
> B.    Any organization over which the Named Insured maintains ownership or
>       majority interest;
>
> C.    House Corporation, Householding Corporations, Chapter Education
>       Foundations, House Associations, Alumni Control Boards, Alumni
>       Advisory Boards, Alumni Associations, Alumni Corporations, Alumni
>       Chapters, Board of Advisors, Board of Governors, Executive Councils and
>       Parent Clubs, but only while acting within the scope of their duties on
>       behalf of the Named Insured;
>
> D.    Officers, Directors, Trustees, Partners, Coordinators, Custodians,
>       Committee Members, Council Members, Volunteers, Housemothers,
>       Resident Advisors, Faculty Advisors, Fraternity members, Member
>       Candidates (Pledges), and Employees of the Named Insured, but only

---

[6]The parties agree that the Named Insured here include PKT, PKT, Inc., PKT Foundation, and
PKT Properties.  Ex. A.  However, UE also avers that the Named Insured also includes the local
PKT chapters throughout the country, which is evident from the language in the contract, which
includes "National Fraternities" in the business description, the operations are "rated" as its
various constituent "Fraternities," and the premium basis that is calculated based upon the
member of Fraternities across the country "per member."  Dupre Decl., Ex. A; Df. Response ¶
12.

6

while acting within the scope of their duties on behalf of the Named
Insured.

Dupre Decl., Ex. A.

Rider received a Certificate of Insurance stating that it was an "additional insured" under

the Landmark Policy issued to PKT.  Badgely Decl. ¶ 11, Ex. B, Certificate of Liability

Insurance; Ex. A.  The Certificate of Liability Insurance, dated September 22, 2006, states:

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY
AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER.  THIS
CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE
AFFORDED BY THE POLICIES BELOW.

\*                 \*                 \*

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO
THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.
NOTWITHSTANDING ANY REQUIREMENT, TERMS OR CONDITIONS OF
ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH
THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE
INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS
SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF
SUCH POLICIES.  AGGREGATE LIMITS SHOWN MAY HAVE BEEN
REDUCED BY PAID CLAIMS.

\*                 \*                 \*

GENERAL AGGREGATE FOR THE GENERAL LIABILITY AND
UMBRELLA COVERAGE APPLIES PER LOCATION.  SELF INSURED
RETENTION OF $2,500 PER OCCURRENCE IS APPLICABLE.  THE
CERTIFICATE HOLDER IS AN ADDITIONAL INSURED UNDER THESE
POLICIES.

Badgely Decl., Ex. B.

The "Additional Insured" section of Endorsement No. 01 states:

The following is named as an additional insured under the policy, but only in
respect to the premises and operations of the Named Insured.

Any person or organization that has requested in writing to be an
additional insured and is shown on such a certificate of insurance.

7

If [sic] is further agreed that naming the above as an additional insured does not serve to increase the company's liability as specified in the declarations of the policy.

Dupre Decl., Ex. A.  The "Other Insurance" section of Endorsement No. 15 states:

1.      This insurance is excess over other valid and collectible insurance available to the insured for a loss we cover under this policy.

2.      We will have no duty under this insurance to defend any claim or "suit" that any other insurer has a duty to defend.  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

3.      The insurance is excess over any of the following insurance, whether primary, excess, contingent or any other basis:

    A.      That is fire, extended coverage, builder's risk or similar coverage for "your work,"

    B.      That is fire insurance for premises rented to you or in your care, custody or control; or

    C.      If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion G. or coverage A (Section I).

    D.      Any insurance policy purchased to insure against a liability loss arising from a special event sponsored, hosted or anyway associated with an insured under this policy.

Id.  Endorsement No. 17 to the Landmark Policy, entitled "Hazing, Sexual or Physical Aubse

[sic] or Molestation Exclusion", states that it "modifies" Commercial General Liability Coverage

because:

This insurance does not apply to "Bodily Injury", "Property Damage", "Personal Injury" or "Advertising Injury" arising out of hazing, sexual or physical abuse, or from molestation by any insured, or any Additional Insured.

This exclusion applies only to those insureds who direct others to participate, and/or participate in the excluded act.

Dupre Decl., Ex. A.

8

### D.    UE Policy's Terms and Conditions

Rider was also insured under a primary general liability policy issued by UE, Policy No. CGL200600117800 (the "UE Policy").  Df. Facts Ex. 5.  The UE Policy includes an "Other Insurance" clause, which states:

> This Policy is a primary Policy of insurance.  However, this Policy shall be excess over any other valid and collectible primary insurance that applies to an Occurrence covered by this Policy, including such insurance naming the Insured as an "additional insured" and, with respect to the limited coverage provided in Paragraphs 10.e.(1) and 10.m.(1)(b), an domestic or foreign Automobile liability insurance policy, and nothing in this Policy shall be construed to require this Policy to contribute with, or subject this Policy to the terms, conditions or limits of, such other insurance.

Df. Facts, Ex. 5 at 10 ¶ 25.

### E.    Rider's Demand Under the Landmark Policy and the Ensuing Coverage Action

Rider tendered the <u>DeVercelly</u> Complaint to Landmark for defense and indemnification. Df. Facts ¶ 37; Pl. Facts ¶ 37.  In a letter, dated November 5, 2007, Landmark disclaimed any current obligation by Landmark to Rider.  Ex. E.  Landmark indicated that "Rider qualifies as an additional insured under the Policy, but only in respect to the premises and operations of the Policy's Named Insured, i.e., [PKT].  In other words, Rider does not qualify as an additional insured for the purposes of its own independent negligence."  <u>Id.</u> at 3.  In a letter, dated March 12, 2008, Landmark stated that it has no coverage obligation to Rider for the <u>DeVercelly</u> Action because the allegations against Rider do not relate to the premises and operations of PKT and implicate Rider's own negligence, for which Rider does not qualify as an additional insured and Landmark is not obliged to defend.  Dupre Decl., Ex. H, Letter from C. Gaza to P. Freed, dated Mar. 12, 2008.  UE is defending Rider in the <u>DeVercelly</u> Action pursuant to the policy UE issued to Rider.

9

On May 5, 2009, Moving Defendants filed an Answer and Amended Counterclaims to Plaintiff's Third Amended Complaint seeking declaratory judgments, that (1) Landmark is obligated to defend Rider, Badgely, Iacovelli and DiDonato; (2) UE is entitled to reimbursement for having to provide a defense on behalf of these Defendants; (3) UE is entitled to indemnification or reimbursement for any judgments against them; and (4) that the UE Policy is excess to any coverage provided to such Defendants under the Landmark Policy.  See Counterclaim ¶¶ 21-47.

On November 7, 2008, Moving Defendants filed a Motion for Summary Judgment in which (1) Rider seeks a declaratory judgment that Landmark owes a defense to Rider, and (2) UE seeks a declaratory judgment that Landmark's coverage obligation is primary to UE's obligation.[7]  On December 5, 2008, Landmark filed Opposition and a Cross-Motion for Summary Judgment arguing that (1) there is an actual conflict between the laws of Ohio and New Jersey with regard to interpretation of its policy and Ohio law applies, and (2) regardless of what law applies, it is entitled to a declaration that it is not obliged to defend any of the defendants.  Moving Defendants opposed Plaintiff's Cross-Motion.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  For the reasons stated herein, the Court finds that New Jersey law governs the Landmark Policy and that Landmark has a concurrent obligation to defend Rider and its employees.  However, Landmark does not have a duty to defend DiDonato with respect to those counts that allege DiDonato, in his capacity as a PKT member, was hazing.

## II.    SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to

---

[7]Rider, however, does not take a position as to whether Landmark's coverage obligation is primary to UE's obligation.  See Df. Mot. Supp. at 1 n. 1.

judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). Indeed, the plain

11

language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249. Credibility determinations are the province of the fact finder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

### A.    Conflict of Laws

This Court "sitting in diversity must apply the conflicts of law principles of the forum state." Henry v. Richardson-Merrell, Inc., 508 F.2d 28, 31 (3d Cir. 1975).  Because New Jersey is the forum state, its conflict of law principles shall apply.  The parties do not dispute that the Supreme Court of New Jersey has held that insurance contracts are generally interpreted pursuant to the law of the state where the contract was entered,[8] but the law of a different state

---

[8]Landmark argues that there is no dispute that it contracted with PKT, its named insured in Ohio. Pl. Mot. Opp. at 21.  However, Moving Defendants do in fact contest this assertion, claiming that "[i]t is not clear that Ohio was the state that negotiation and contracting for the Landmark Policy occurred," where the PKT insurance broker negotiated from Chicago, Illinois and the Landmark agent negotiated from Atlanta, Georgia.  Df. Mot. Opp. at 6 n. 2.  The record does reveal that at all times PKT was located in Oxford, Ohio.  See Dupre Decl. Ex. A & C.

Moving Defendants contend that Ohio becomes even more remote here because it is Rider's rights under the Landmark Policy that are at issue in this case, and Rider, the litigant urging that forum law be applied, was not a party to the insurance contract.  Allstate Ins. Co. v. Hague, 449 U.S. 302, 328 n. 20 (1981) ("While contracting parties may be able to provide in advance that a particular rule of law will govern disputes between them, their expectations are clearly entitled to less weight when the rights of third-party litigants are at issue").  Moving Defendants assert that with respect to Rider, the place of negotiating and contracting is New

12

should be used if another state has a more significant interest.

Accordingly, the Court will apply New Jersey's most significant relationship test to this contract claim.  Agostino v. Quest Diagnostics Inc., — F.R.D. —, 2009 WL 348898, *22 (D.N.J. Feb. 11, 2009) (citing State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28, 34 (1980)); Pittston Co. v. Allianz Ins. Co., 795 F. Supp. 678, 687 (D.N.J. 1992).  New Jersey's most significant relationship test consists of two prongs.  The first prong of the analysis requires a court to examine the substance of the potentially applicable laws in order to determine if an actual conflict exists.  P.V. v. Camp Jaycee, 197 N.J. 132, 143-44 (2008) (citing Lebegern v. Forman, 471 F.3d 424, 430 (3d Cir. 2006)).  Where there is no actual conflict, the analysis ends and the court applies the law of the forum state.  See In re Ford Motor Co., 110 F.3d 954, 965 (3d Cir. 1997); Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615, 621, 917 (2007).  The second prong of the most significant relationship test requires the Court to weigh the factors enumerated in the Restatement section corresponding to the plaintiff's cause of action.  See Camp Jaycee, at 197 N.J. at 143-44.

### a.      Prong-One: Whether there is an Actual Conflict

The first prong of the governmental interest test requires this Court to determine whether there is an actual conflict between the laws of the states involved, see Camp Jaycee, 197 N.J. at 143-44, or whether a false conflict exists.  LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d

---

Jersey.  Df. Mot. Opp. at 6 n. 2.  In addition, Rider received the Certificate of Insurance – the document that allegedly qualified it for additional insured status – from Nebraska.  See Id.; Df. Facts, Ex. 3.  In this case, there is no express indication with respect to the parties' expectations of what law would apply.  The insurance policy provided coverage for accidents throughout the United States, and thus, at the time of contracting, "the parties certainly could have anticipated" that the law of States other than Ohio would govern particular claims arising under the policy.  Allstate, 449 U.S. at 329.  Therefore, the decision to apply the law of the forum in this case does not frustrate the reasonable expectations of the contracting parties.  Id.

Cir. 1996).  The conflict is determined by whether a "distinction" exists between the substance of the potentially applicable laws.  Camp Jaycee, 197 N.J. at 143.  Under Ohio law, in the context of  "additional insured" provisions, language similar to "arising out of" is construed to "protect the additional insured…from being vicariously liable for the tortious acts of the named insured."  Davis v. LTV Steel Co., 128 Ohio App. 3d 733, 737 (Ohio Ct. App. 1998); see e.g., Sprouse v. Kall, 2004 Ohio 353, P9 (Ohio Ct. App. 2004) ("The 'additional insured' provision in the policy at issue is intended to protect [the additional insured] from vicarious liability for the acts or omissions of [the primary insured]").

By contrast, New Jersey law requires only a "substantial nexus" between the primary insured's acts or omissions and the occurrence giving rise to the claim by an additional insured. See e.g., County of Hudson v. Selective Ins. Co., 332 N.J. Super. 107, 114 (App. Div. 2000) (citing Westchester Fire Ins. Co. v. Continental Ins. Cos., 126 N.J.Super. 29, 38 (App. Div. 1973)).  The Court finds that, in comparison to Ohio law, the inherently broader scope of New Jersey's "substantial nexus" language manifests a "distinction" such that an actual conflict of law exists.[9]

### b.    Prong-Two: The Interest Each State has in Applying its Law

Because there is an actual conflict, the Court must weigh the factors enumerated in the Restatement section corresponding to the Plaintiff's cause of action.  See Camp Jaycee, 197 N.J.

---

[9] Indeed, the Court of Appeals of Ohio in Davis stated that it disagreed that "the language of the additional insured endorsement should be construed broadly such that [additional insured] was protected from all liability arising out of or connected to the operations of [primary insured]." Davis, 128 Ohio App. 3d at 736.  Conversely, the New Jersey courts have held in the affirmative that "arising out of" language should be construed "in a broad and comprehensive sense." County of Hudson, 332 N.J.Super. at 114; Liberty Village Associates v. West American Ins. Co., 308 N.J. Super. 393, 400 (App. Div. 1998); Harrah's Atlantic City, Inc. v. Harleysville Ins. Co., 288 N.J. Super. 152, 157 (App. Div.1996).

at 143-44.  Plaintiff's insurance contract is governed by Section 193 of the Restatement (Second)

of Conflict of Laws, entitled "Contracts Of Fire, Surety Or Casualty Insurance," which states:

> The validity of a contract of fire, surety or casualty insurance and the rights
> created thereby are determined by the local law of the state which the parties
> understood was to be the principal location of the insured risk during the term of
> the policy, unless with respect to the particular issue, some other state has a more
> significant relationship under the principles stated in § 6 to the transaction and the
> parties, in which event the local law of the other state will be applied.[10]

Importantly, where the "'subject matter of the insurance is an operation or activity' and ... 'that

operation or activity is predictably multistate, the significance of the principal location of the

insured risk diminishes.'"  Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co., 134 N.J.

96, 111-12 (1993). The Landmark Policy covers chapters throughout the United States and thus

the policy is predictably multistate.[11]

    In this case, the parties dispute that the contract giving rise to Plaintiff's claims was

negotiated and contracted for in Ohio.  Moving Defendants further argue that Landmark knew

that it was insuring a risk that was not centrally located in Ohio, but rather could arise in any

state in which PKT had a chapter.  In addition, Moving Defendants contend that New Jersey has

a more significant relationship in this case to the transaction and the parties under the principles

stated in § 6.

    Section 6 of the Restatement considers the following factors:

    (a) the needs of the interstate and international systems,

    (b) the relevant policies of the forum,

___

[10] There is little doubt Section 193 is the appropriate Restatement section: "We conclude that in determining the choice-of-law rule to govern casualty-insurance contracts … we look first to Restatement [S]ection 193."  Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co., 134 N.J. 96, 111-12 (1993).

[11] Indeed, Landmark itself states that "there is no genuine dispute that the Landmark Policy applied to risks throughout the United States." Pl. Mot. Reply at 5.

15

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6.  The Court need not undertake an elaborate analysis of each of the seven factors, as the New Jersey Supreme Court, in an effort to simplify choice of law disputes, condensed the Restatement factors into four broader categories: (1) the competing interests of the relevant states, (2) the national interests of commerce among several states, (3) the interests of the parties in realizing justified expectations and achieving predictable results, and (4) the interests of judicial administration.  Robeson Indus. Corp. v. Hartford Accident & Indem. Co., 178 F.3d 160, 165 (3d Cir. 1999) (citing Pfizer, Inc. v. Empris Ins., 154 N.J. 187, 196-99 (1998)).

To gauge the competing interests of the relevant states, the Court will "consider whether application of a competing state's law under the circumstances of the case 'will advance the policies that the law was intended to promote.'"  General Ceramics v. Firemen's Fund Ins. Cos., 66 F.3d 647, 656 (3d Cir. 1995).  New Jersey's "substantial nexus" interpretation of "arising out of" language underscores New Jersey's policy of liberally construing ambiguous insurance agreement language in favor of the insured.  See Westchester, 126 N.J.Super. at 39.  Thus, the broader "substantial nexus" language more aptly accords with New Jersey's insurance interpretation policies.

Based on the record in this case, the second factor, the national interests of commerce amongst the states, weighs in favor of New Jersey law.  As a point of reference, the Court turns

16

to the facts in <u>Pfizer</u>.  There, the Supreme Court determined that although Pfizer maintained a presence in New Jersey, and indeed some of the waste sites were located in New Jersey, because the waste sites at issue in some of the claims were located in six other states, applying New Jersey law to those claims would unduly burden interstate commerce.  <u>Pfizer</u>, 154 N.J. at 202. Specifically, the <u>Pfizer</u> Court pointed out that at least with respect to the claims arising from the waste sites not in New Jersey, New Jersey lacked a dominant and significant relationship to those claims: "Concerning factor two, application of New Jersey's conflicting view of the pollution-exclusion clause would hinder the interests of commerce among the several states if that law were to be applied to determine a dispute with which New Jersey did not have a dominant and significant relationship."  <u>Id.</u>

 Here, unlike <u>Pfizer</u>, where the Court was faced with claims arising from waste sites in six states, the Court is concerned with only what factual ties, if any, Ohio and New Jersey may have with this litigation and the <u>DeVercelly</u> Action.  The only purported connections to Ohio germane to this case are (1) the disputed claim that the insurance agreement was negotiated in Ohio and (2) the fact that PKT's administrative offices are located in Oxford, Ohio.  Conversely, Rider, DiDonato, Torney, Cagulero, Olsen, Badgely, Iacovelli, Main, Marcus, Encompass and Farmers all reside in New Jersey.  More importantly, the events giving rise to the underlying lawsuit stem from an incident at the PKT Chapter house, located in New Jersey.  Finally, the insurance rights at issue will require this Court to ultimately determine whether the aforementioned New Jersey residents will be covered under Landmark's policy.  It is abundantly clear, based on the record before this Court, that New Jersey has the dominant significant relationship to this dispute. Thus, the Court finds that because New Jersey has the dominant significant relationship with the dispute, applying New Jersey law would not do violence to the national commerce between

17

states.

Regarding the third factor, Landmark states that because it allegedly contracted with PKT in Ohio, Ohio law should apply.  Pl. Mot. Opp. at 23.  Landmark also denies, as an insurer of risks throughout the United States, that it expected New Jersey law would apply.  On the other hand, Moving Defendants contend that Rider negotiated this Policy in New Jersey because Rider received the Certificate of Insurance at its campus in New Jersey.  Def. Mot. Opp. at 6, n.2.  The parties do not dispute that the Policy contains no choice of law clause.  "In the absence of a choice-of-law provision, a policyholder would expect that it would be indemnified under the law in effect at the place where liability is imposed."  Pfizer, 154 N.J. at 203. While Landmark admits that it insures risks throughout the United States, Rider is exclusively located in New Jersey.  Especially in light of the absence of a choice of law provision in the Policy, it is axiomatic that an insurer of a national organization with associates throughout the United States would expect the law of the state where the location of the risk exists to apply.  Furthermore, Landmark's argument that it expected Ohio law would apply is belied by its disclaimer titled "State Fraud Statements," which lists the Fraud Statements of nineteen states and the District of Columbia.  See Landmark Policy.  Landmark does not explain why it would provide these disclaimers in the Policy if it expected only Ohio law to apply.  Thus, in this case, Rider had a stronger expectation that New Jersey law would apply.

Fourth, according to the Court in Pfizer, "the interests of judicial administration require a court to consider whether the fair, just and timely disposition of controversies within the available resources of courts will be fostered by the competing law chosen.  In other words, what choice of law works best to manage adjudication of the controversy before the court."  Pfizer, 154 N.J. at 199.  Neither Landmark nor Moving Defendants contend that the interests of judicial

administration would be affected differently by applying one state's law over the other. This Court can manage the adjudication of this dispute regardless of whether Ohio or New Jersey law applies.

Taken together, the competing interests of Ohio and New Jersey, the national interests of commerce among several states, the interests of the parties in realizing justified expectations and achieving predictable results, and the interests of judicial administration, the Court finds that on balance, New Jersey law applies to the ensuing issues of contract interpretation.

**B.      Rider Qualifies as an Additional Insured Under the Landmark Policy**

**a.      The Chapter is a Part of PKT, the Named Insured**

Turning to the substance of the present Motions, Landmark contends that the events at the Chapter house were not the "operations" of the "Named Insured," PKT, because PKT refers only to the National Fraternity and not the individual PKT chapters.  Pl. Mot. Opp. at 20, 29. Moving Defendants argue that the Chapter is a part of the National Fraternity.  Df. Mot. Supp. at 8.  The Court, however, is unpersuaded by Landmark's attempt to divorce the National Fraternity from its individual chapters in respect to its premises and operations.

In any contract, "a court's paramount consideration is the intent of the parties."  Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980).  Ideally, the clearest indication of the parties' intent is the language of the contract itself.  Id.  Thus, when the language of the contract is unambiguous, that is, when the contract is "reasonably capable of only one construction," Wyeth, 119 F.3d at 1074, the inquiry ends and the court must enforce the contract as written.  However, when the language in a contract is capable of more than one reasonable construction as determined by "objective indicia ... [viewed] from the linguistic reference point of the parties," the contract is ambiguous and the court should look beyond the

19

four corners of the contract to extrinsic evidence, such as party negotiations, to discern and give meaning to the intent of the parties.  Mellon, 619 F.2d at 1009; Sumitomo Machinery Corp. v. Allied Signal, Inc., 81 F.3d 328, 332 (3d Cir. 1996).  However, the Court should "avoid ambiguities if the plain language of the contract permits ... [and] should not torture the language ... to create ambiguities."  Wall Street Aubrey Golf v. Aubrey, 189 Fed. Appx. 82, 85 (3d Cir. 2006) citing First State Underwriters Agency of New England Reinsurance Corp. v. Travelers Ins. Co., 803 F.2d 1308, 1311 (3d Cir. 1986).  The parties at all times remain bound by the "appropriate objective definition" of the words contained in the contract.  Mellon, 619 F.2d at 1013.  In this case, neither party argues that there is a dispute concerning an ambiguity in the insurance contract.  Thus, the Court will look at the plain language of the contract to determine its interpretation here.

Throughout the Landmark Policy, the Named Insured is broadly described as "Phi Kappa Tau Fraternity" as opposed to a more limited description such as, for example, the "National Fraternity."  Further, the business description and operations of the insured are described as "National Fraternities," not "National Fraternity."  In addition, the premium policy is calculated "per member."  Moreover, the fact that Landmark is defending both the National Fraternity and the Chapter in the DeVercelly Action further controverts Landmark's argument.  Accordingly, the Chapter is a part of the Named Insured.

### b.    Rider is an Additional Insured

The parties also dispute whether Rider qualifies as an additional insured under the Landmark Policy.  The relevant language at issue is contained in the "Additional Insured" endorsement in the Landmark Policy, which provides for the additional insured's coverage "only in respect to the premises and operations of the Named Insured."  As a threshold matter, the

parties do not dispute that Rider satisfied the provision's requirement that a putative additional insured request in writing to be an additional insured and obtain a certificate of insurance. Because New Jersey law applies, see Part III A, supra, the resolution of whether Rider is an additional insured will be determined by whether a "substantial nexus" exists between the primary insured's acts or omissions and the occurrence giving rise to the claim.  See, e.g., County of Hudson, 332 N.J. Super. at 114.

Landmark argues that no "substantial nexus" exists because the allegations against Rider, as detailed in Counts I-V of the DeVercelly Action, result from Rider's own actions as opposed to PKT's.  In support of this argument, Landmark cites to Pennsville Shopping Center Corp. v. American Motorists Ins. Co., 315 N.J.Super. 519 (App. Div. 1998).  Landmark argues that Pennsville holds  "where the conditions alleged to result in liability of the additional insured are the responsibility of the additional insured rather than the named insured, the required substantial nexus does not exist."  Pl. Mot. Opp. at 32.  However, this interpretation is incorrect because it fails to account for the fact that the "responsibility" of the additional insured in that case was expressly assumed by the additional insured in an underlying lease agreement.  Pennsville, 315 N.J.Super. at 523.  The lease agreement in Pennsville provided "that [primary insured] would indemnify landlord from loss or liability for damages 'occurring on the demised premises except [for those] due to Landlord's negligence.'"  Id. at 521.  Thus, the facts of this case are clearly distinguishable because there is no such underlying exclusion for Rider's own acts of negligence.

Contrary to Landmark's contention, the determination of whether Rider is an additional insured does not turn on whether the allegations against Rider involve acts or omissions for which PKT had responsibility; it turns on whether a "substantial nexus" exists between the

Chapter's acts or omissions and the occurrence giving rise to the claim.  It must be stressed that it is the underlying events, the activities at the PKT chapter house, that give rise to <u>all</u> the claims at issue in the <u>DeVercelly</u> Action.  The "Big/Little" celebration occurred at the PKT house with PKT members and pledges.  Therein, the fatal alcohol consumption occurred, as did the alleged hazing.  Indeed, the factual allegations germane to claims against Rider and its employees arise from Rider's responsibility to oversee and manage Greek organizations on its campus and discipline those that run afoul of school policy.  By way of example, in a count titled "Defendant Rider University's Premises Liability for its Gross and Reckless Neglect of its Students," the Complaint in the <u>DeVercelly</u> Action alleges:

> Defendant Rider University knew, or should have known, that its failures as the landlord of the PKT Chapter House posed an unreasonable risk of harm to its students residing in the PKT Chapter House because of well known information and studies demonstrating that the risk of serious injury, death, hazing, and binge drinking is far higher and more foreseeable in Greek facilities than in other residential facilities, and because of specific facts known to Rider University regarding the illegal underage drinking and hazing occurring at the PKT Chapter House and other fraternities before [DeVercelly's] death.

<u>DeVercelly</u> Compl. ¶ 175.  In other counts, the <u>DeVercelly</u> Action highlights Rider's alleged failure to enforce its policies that govern fraternities, such as ensuring that all fraternities comply with New Jersey's drinking age, or alternatively, negligently carrying out its self-imposed duties, such as hiring and supervising the house manager it required each fraternity to have.

Essentially, the factual allegations underlying the <u>DeVercelly</u> Action, at least with respect to Rider, tend to show that Rider's liability wholly arises from its decision to permit fraternities such as PKT on its campus, and in turn, its assumed duty to maintain and supervise those organizations.  While Landmark attempts to construe the allegations against Rider as acts or omissions arising from Rider's independent duty to oversee its students in general, whether it be a fraternity or chess team, Landmark fails to distinguish the different set of rules that applied

22

to fraternities and the policy that Rider maintained, specifically that fraternities, in order to be chartered on campus, were required to name Rider as an additional insured on their respective insurance policies.  Rafferty Decl. ¶¶ 4-5.  Notably absent from Landmark's papers is the fact that Rider maintained a separate Office of Greek Life, as alleged in the DeVercelly Complaint, whose inaction and alleged negligence directly resulted in DeVercelly's death.  Landmark cannot escape its obligations and the very obvious conclusion the Court draws from this fact, that in permitting fraternities on its campus, Rider assumed a duty to oversee them, and as such, required additional insurance coverage.[12]  Certainly, Rider's duty to manage, or alleged failure to manage, fraternities on its campus is inextricably intertwined with the events leading up to DeVercelly's death.  For these reasons, the Court finds as a matter of law that because a substantial nexus exists between the events at the PKT house and DeVercelly's death, Rider qualifies as an additional insured under the Landmark Policy.[13]

Moreover, Landmark overstates the reach of Englert v. The Home Depot, 389 N.J.Super. 44 (App. Div. 2006).  In its papers, Landmark suggests that Englert stands for the proposition that coverage for an additional insured is excess to that additional insured's own coverage, absent express language.  The problem with this interpretation is that in Englert, the excess clause at issue exclusively relied on the parties' subcontract arrangement: "This insurance is excess over any valid and collectable insurance unless you have agreed in a written contract for

---

[12]The Complaint in the DeVercelly Action goes into great detail about the unfortunate consequences of binge drinking and how in virtually all those instances, the individual was a member of a Greek organization.  Several reports cited in the Complaint exclusively studied alcohol-related deaths of members of Greek organizations, and how these reports should have alerted Rider to the risk of similar tragedies occurring on the Rider campus.

[13] Moving Defendants argue that if the Court concludes that Rider is not an additional insured under the Landmark Policy it would be contrary to Rider's reasonable expectations.  Because the Court finds that Rider is an additional insured, the Court need not further address this argument.

23

this insurance to apply on a primary or contributing basis." Id. at 58 (emphasis in original). Indeed, the Appellate Division held that the aforementioned policy's express condition had not been met because the subcontractor agreement did not refer or promise primary coverage in any instance. Here, the challenged excess clause contained in the Landmark Policy is devoid of similar language and does not suggest, for instance, that it will only apply as primary insurance subject to the provisions of a separate agreement between the parties. Accordingly, Landmark has a duty to defend Rider in the DeVercelli Action. See Part III C (a), infra.

### C. Landmark has a Duty to Defend Rider, Badgely, and Iacovelli, but not DiDonato

Under New Jersey law, the "duty to defend" is a contractual obligation defined by the insurance policy. Horesh v. State Farm Fire & Cas. Co., 265 N.J. Super. 32, 38 (App. Div. 1993). The insurer has a duty to defend the insured "when the complaint states a claim constituting a risk insured against." Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 173-74 (2008). This duty is broader than the duty to pay, NPS Corp. v. Insurance Co. of No. Amer., 213 N.J. Super. 547, 550-51 (App. Div. 1986), but only because the duty to defend, unlike the duty to pay, is not dependent upon the ultimately determined merits of the claim. Sahli v. Woodbine Board of Education, 193 N.J. 309, 322 (2008). Whether an insurer has a duty to defend is determined by comparing the allegations in the complaint with the language of the policy. When the two correspond, the duty to defend arises, irrespective of the claim's actual merit. Danek v. Hommer, 28 N.J.Super. 68, 76-77 (App. Div. 1953). Moreover, "[i]f the complaint is ambiguous, doubts should be resolved in favor of the insured and thus in favor of coverage." Voorhees, 128 N.J. at 173. If the complaint asserts both covered and non-covered claims, "the duty to defend will continue until every covered claim is eliminated." Id. at 174.

Conversely, there is no duty to defend if the claim is beyond the scope of the insuring

24

agreement or precluded by a policy exclusion. <u>Central National Ins. Co. v. Utica Nat. Ins. Group</u>, 232 N.J.Super. 467, 569-71 (App. Div. 1989). Thus, when an excluded claim is made against the insured, the insurer has no duty to defend. <u>Id.</u> Further, in circumstances where there is a multi-count complaint, the duty to defend extends only to counts containing covered claims. <u>Grand Cove II Condominium Ass'n v. Ginsberg</u>, 291 N.J.Super. 58, 71-74 (App. Div. 1996).

### a. Rider

Rider, as an "Additional Insured," is entitled to a defense from Landmark. All five of the allegations against Rider arise out of the premises and operations of PKT and the consequential death of DeVercelly. Landmark does not dispute that "bodily injury," which the policy states includes death, is a risk insured against. Counts I-V against Rider in the <u>DeVercelly</u> Action arise out of DeVercelly's "bodily injury" and, as such, Landmark has a duty to defend Rider.[14]

### b. Badgely and Iacovelli

Landmark disputes that it owes a duty to defend Rider employees Badgely and Iacovelli because they are individual defendants who were not issued the Certificate of Insurance Rider obtained. Landmark admits that Badgely and Iacovelli allegedly oversaw the Chapter on behalf of their employer, Rider, yet proceeds to argue that their oversight was "essentially an independent obligation." Pl. Mot. Opp. at 27. There is no genuine issue that the claims against Badgely and Iacovelli arose out of their duties as Rider employees and on behalf of Rider, not independently. They, at the time of the incident, were paid employees of Rider who were obligated to oversee and manage the affairs of Greek organizations on the Rider campus. Now,

---

[14]The Court notes that in Count V of the <u>DeVercelly</u> Action Complaint, the plaintiff alleges that Rider "provid[ed] substantial and material support to PKT and its members and their activities, and by failing to take appropriate steps to stop illegal hazing and underage drinking at PKT and its other fraternities." <u>DeVercelly</u> Compl. ¶ 198. Notwithstanding this allegation, Landmark does not contend that Rider is barred from coverage under the Landmark Policy under its Hazing Exclusion.

25

in the DeVercelly Action, one of those primary obligations, hiring a house manager for each fraternity to oversee and manage the day-to-day affairs of the fraternity, and the judgement exercised by those Rider employees, has been called into serious doubt.  The Complaint in the DeVercelly Action clearly states that "Badgely. . .and Iacovelli breached their duty to manage PKT and its members, and were grossly negligent and reckless, by, inter alia; (a) [e]mploying as PKT House Manager a PKT member nominated by the PKT fraternity. . .a student not appropriately trained in risk management."  DeVercelly Compl. ¶ 152.  The Complaint goes on to allege that Badgely and Iacovelli, in their capacity as Rider employees, were responsible for carrying out Rider's assumed duty of management and oversight over fraternities on campus. Because Rider had an obligation to regulate fraternities and their activities and as a result, it is entitled to coverage as an additional insured under the Landmark Policy, it follows that the employees charged with those tasks would be entitled to the same.

Furthermore, RSUI Group, Inc., on behalf of Landmark, understood that "Rider University and its employees such as Ms. Badgley [sic] and Ms. Iacovlli [sic] qualify as an additional insureds [sic] under the [Landmark Policy], but only in respect to the premises and operations of the [Landmark Policy's] Named Insured, i.e., the National."  (Dupre Decl., Ex. L, at 3.)  Landmark is correct that there is no dispute that Badgely and Iacovelli did not request to be identified on a certificate of insurance, but this fact is irrelevant given the Certificate of Insurance issued to Rider and Landmark's obligation to defend Rider and its employees. Clearly, the policy Landmark issued to PKT, which listed Rider as an additional insured, extends coverage to Rider's employees:

2. Each of the following is also an insured:

a. Your "employees," other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability

company) or your mangers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

Dupre Decl., Ex. A, Landmark Policy.[15]  Viewed in the context of this provision, the Certificate effectively establishes that those Rider employees were acting within the scope of their employment as additional insureds, at least with respect to the premises and operations of PKT.[16] Because Badgely and Iacovelli qualify as additional insureds under the Landmark Policy, Landmark owes a defense obligation to them.

**c.    DiDonato**

While DiDonato, as a Rider employee, is also an "Additional Insured" under the Landmark Policy, the Court finds that the "Hazing Exclusion" applies and relieves Landmark from its defense obligation.  The "Hazing Exclusion" of the Landmark policy states: "This insurance does not apply to 'Bodily Injury'…'Personal Injury'…arising out of hazing, sexual or physical abuse, or from molestation by any Insured, or any Additional Insured.  This exclusion applies only to those Insureds who direct others to participate, and/or participate in the excluded act."

Moving Defendants contend that the <u>DeVercelly</u> Complaint does not specifically allege that DiDonato participated in or directed others in connection with DeVercelly's drinking of alcohol and thus the "Hazing Exclusion" should not apply.  According to the <u>DeVercelly</u>

---

[15]Landmark does not contend that Rider, as an additional insured, is not entitled to the same benefits and coverage as defined in the underlying policy that Landmark issued to PKT. Thus, while it is not at issue here, the Court finds that as an additional insured, Rider is entitled to the same coverage provided for in the Landmark Policy.  The endorsement attached to the Landmark Policy buttresses this conclusion.  <u>See</u> Dupre Decl., Ex. A, Landmark Policy.

[16] <u>See</u> <u>supra</u> pp. 19-23 for the discussion of the "substantial nexus" between the premises and operations of PKT and Gary DeVercelly's death.

Complaint, DiDonato "was at the PKT house during the Big/Little event on [the night of alleged

hazing]; witnessed the ritual and its aftermath; provided substantial support for the event, and did

nothing to stop what was obviously illegal and dangerous." DeVercelly Compl. ¶ 12.  The

DeVercelly Complaint further alleges that DiDonato violated the New Jersey Anti-hazing

Statute.[17]  Moving Defendants' interpretation is far too narrow in its scope.  The DeVercelly

Complaint alleges that DiDonato "witnessed" and "provided substantial support" for the

Big/Little event which allegedly gave rise to DeVercelly's death, allegations that fit squarely

within the ambit of the Landmark Policy's "Hazing Exclusion."

Other counts alleged against the PKT members, including DiDonato, implicate the

Chapter's actions in forcing a minor to drink alcohol (Counts Eight and Nine) and the collective

failure of the Chapter and its members to provide adequate care to DeVercelly after he fell ill

(Counts Ten and Eleven).  Specifically, the DeVercelly Complaint alleges that after DeVercelly

became ill, DiDonato and other fraternity members failed to procure an ambulance in time and

"[u]nreasonably delay[ed] a call to 911 or other emergency personnel." DeVercelly Compl. ¶

242.  Without this Court limiting or defining the plaintiff's claims in the underlying action, these

allegations could be considered separate and discrete acts, or failures to act, from Count Seven,

which specifically alleges hazing.

Nevertheless, the expansive reach of the Hazing Exclusion would encompass these

counts because the negligence in serving a minor alcohol or failing to obtain medical care in a

timely fashion would, as the DeVercelly Complaint alleges, either flow directly from injuries

---

[17] N.J.S.A. § 2C:40-3 states: "A person is guilty of hazing, a disorderly persons offense, if, in connection with initiation of applicants to or members of a student or fraternal organization, he knowingly or recklessly organizes, promotes, facilitates or engages in any conduct, other than competitive athletic events, which places or may place another person in danger of bodily injury."

28

DeVercelly suffered from the alleged hazing or were crucial to the acts which are alleged to constitute hazing. As alleged in the <u>DeVercelly</u> Complaint, all of the acts, including those claims of negligence in caring for DeVercelly or serving him alcohol, are based on the theory that the fraternity members forced DeVercelly to consume alcohol: "As a direct and proximate result of the Fraternity defendants' negligence per se, Gary suffered terribly and experienced severe emotional distress as he was compelled to drink inordinate amounts of alcohol under circumstances constituting legal distress." <u>DeVercelly</u> Compl. ¶230.   As such, DiDonato is excluded from coverage under the Landmark Policy and Landmark owes no duty to defend him in the underlying lawsuit.

The difficulty with resolving what obligation, if any, Landmark has to defend DiDonato is that DiDonato, as alleged in the <u>DeVercelly</u> Complaint, wore two hats the night of DeVercelly's death.  While the Hazing Exclusion, as contained in the Landmark Policy, resolves those claims alleged against DiDonato in his capacity as a fraternity member, it does not necessarily dispose of allegations contained in the <u>DeVercelly</u> Complaint that describe DiDonato as an improperly trained, conflicted, and negligent house manager.  However, those allegations arise several times throughout the Complaint in the context of allegations against Rider, Badgely and Iocavelli's negligence in hiring and failing to supervise DiDonato as house manager. None of the counts names DiDonato as a defendant for his actions as house manager nor seek relief from DiDonato in that capacity.  Importantly, the plaintiff in the <u>DeVercelly</u> Action specified in each count against whom relief is sought, and again, failed to name DiDonato in his capacity as house manager.  Indeed, even in Count Four, which alleges that Rider its vicariously liable for DiDonato's gross negligence, Count Four does not seek relief from DiDonato for his actions, but rather, seeks only relief from Rider.  Thus, none of the counts alleged can be construed as

naming DiDonato individually in his capacity as house manager.  Accordingly, the Court finds

that Landmark is under no obligation to defend DiDonato in the <u>DeVercelly</u> Action.

### d.    Torney

In its "Brief in Opposition to [Moving Defendants'] Motion for Summary Judgment and

In Support of [Landmark's] Cross-Motion for Partial Summary Judgment," Landmark argues it

has no duty to defend Torney.[18] The Court notes that Torney is not listed in Landmark's "Notice

of Cross-Motion of [Landmark] for Partial Summary Judgment," and therefore his rights are not

at issue on the partial motion for summary judgment.  In a letter submitted on December 31,

2008, Torney and Amica's counsel expressed concern over the scope of this motion and further

requested time to brief any coverage allegedly owed to Torney, if Torney was being considered

in this motion. Torney's counsel was assured by "all counsel" that Torney's rights are not at

issue on these motions, which "deal strictly with the right to a defense by Rider University and

its employees."  <u>See</u> Torney Letter at 2. Moreover, Plaintiff failed to respond to the Torney

Letter.  While the Court preserves Torney's rights at this time,  the Court also notes that Torney

faces an uphill battle in demonstrating why the "Hazing Exclusion" would not similarly apply to

him. <u>See</u> Part III (C) (c).  Thus, the Court orders that if Torney believes that his rights would be

adversely affected by this Court's decision and that arguments not advanced during this motion

can be made that would preclude application of the Hazing Exclusion to Torney, he must inform

this Court within twenty days of this Opinion.

### D.    Landmark's Coverage is Concurrent to UE's Primary Coverage

The parties dispute whether Landmark's coverage is primary to UE's excess.  Moving

Defendants argue that UE's coverage is excess to Landmark's, while Landmark argues any

---

[18] <u>See</u> Pl. Mot. Opp. at 27, 34-36.

obligation it has to defend Moving Defendants would be concurrent to United Educator's

coverage.[19]   When two competing insurance agreements contain conflicting "other insurance"

provisions, "the judicial response is to disregard them as being mutually repugnant, thereby

requiring that the loss be pro-rated."   Prudential Property & Cas. Ins. Co. v. New Hampshire Ins.

Co., 164 N.J.Super. 184, 190 (Law Div. 1978).  The mutual repugnance doctrine, as enunciated

in Cosmopolitan Mutual Insurance Co. v. Continental Casualty Co., 28 N.J. 554 (1959), informs

this Court's analysis.  There, the New Jersey Supreme Court held where each of two policies

claims that it will be excess to the other's primary, the court must impose a concurrent obligation

on both insurers.  Otherwise, the Cosmopolitan Court noted, both insurance companies could

evade any obligation to the insured by asserting that the other company retains the role as the

primary insurer, without, at any point, resolving the insurer's claims: "If literal effect were given

to both clauses the result would be that neither policy covered the loss.  Such a result would

_____

[19] In response to the New Jersey Supreme Court's decision in Cosmopolitan, the insurance
industry drafted the Guiding Principles of Overlapping Insurance ("Guiding Principles"), a set of
rules which would govern the interpretation and application of dueling excess clauses.  See
Pasker v. Harleysville Mutual Insurance Co., 192 N.J.Super. 133, 139 (App. Div. 1983)
(describing the Guiding Principles as "a document adopted and used by the insurance industry to
resolve disputes between insurance companies when the applicable policies have 'other
insurance' clauses").  Without delving into how the Guiding Principles operate, this Court notes
that they essentially supplant the mutual repugnance doctrine as enunciated in Cosmopolitan
when the insurers are both signatories to the document. Commercial Union Insurance Co. v.
Bituminous Casualty Corp., 851 F.2d 98 (3d Cir. 1988) (applying the Guiding Principles to
concurrent excess clauses to determine whether they were incompatible); ALI, Inc. v. General,
966 F. Supp. 324 (D.N.J. 1997) (finding that "the doctrine of mutual repugnance is still the law
of New Jersey, except where the two disputing insurance companies are signatories to the
Guiding Principles").

Here, neither party avers that they are signatories nor argue that the Guiding Principles should
govern the dispute between the parties. In fact, both parties primarily rely on Cosmopolitan and
its progeny in their papers. Therefore, in accordance with Commercial Union and in the absence
of the Guiding Principles, the Court will apply the mutual repugnance doctrine to the competing
"other insurance" clauses at issue.

31

produce an unintentional absurdity which neither party urges."  Id. at 559; Universal

Underwriters Insurance Co. v. CNA Insurance Co., 308 N.J. Super. 415 (App. Div. 1998)

(quoting Cosmopolitan).  Therefore, the rule announced in Cosmopolitan applies where

insurance policies contain similar "other insurance" clauses that effectively would strip the

insured of any coverage.  ALI, 966 F. Supp. at 327 (citing Cosmopolitan) (stating "where two

insurers both provide that they shall be 'excess insurance,' the two provisions cancel each other

out under the doctrine of mutual repugnance").

        Moving Defendants assert that a "fair reading," following certain delineated contract

interpretation rules[20] of the "Other Insurance" provision of the Landmark Policy results in a

determination that the Landmark Policy "claims to be excess of only certain other types of

insurance policies when those policies also claim to be excess."  Df. Mot. Supp. at 15.  However,

taking the "Other Insurance" provision as a whole, the Court does not agree that the Policy is

excess only to the insurance listed in paragraph three of the "Other Insurance" provision.  Both

paragraphs one and three of the "Other Insurance" clause are distinct provisions.  The first

paragraph clearly provides that the Landmark policy is excess over "other valid and collectible

insurance available to the insured for a loss we cover under this policy."  Moving Defendants'

attempt to marginalize paragraph one in the presence of paragraph three is unpersuasive to this

Court because paragraph three serves a specific, independent purpose.[21]  Even if it did not serve

this purpose, Moving Defendants cannot avoid the plain language of paragraph one.

        Moving Defendants further argue that UE's policy is not "available" to Rider because

---

[20] See Df. Mot. Supp. at 14.

[21] Landmark states that the purpose of the additional clause is to make Landmark's coverage
excess to those specific types of insurance "even if those other policies contain a general excess
'other insurance' clause."  Pl. Mot. Reply at 14.

UE's "Other Insurance" provision "provides only excess coverage in the presence of the Landmark Policy." Df. Mot. Opp. at 14. Their argument is essentially circular, and is precisely the type of posturing warned of in <u>Cosmopolitan</u>, because it avoids the "mutually repugnant" nature of both policies' "Other Insurance" clauses in order to establish Landmark as primary at the outset. Ultimately, the "Other Insurance" provisions are so substantially similar that a conflict between the two is unavoidable.[22] In light of this conflict, the Court finds that the two clauses are "mutually repugnant" and any obligation to defend Moving Defendants must be shared concurrently between Landmark and UE.

Finally, Landmark argues that it has no defense obligation unless and until the applicable self-insured retentions are satisfied. Landmark asserts that the Policy includes a self-insured retention of $2,500 as well as an additional $75,000 self-insured retention for a total of $77,500 dollars. Pl. Mot. Opp. at 39. UE disputes that amount in its "Response To Landmark's Statement Of Material Facts."[23] Besides this brief mention, however, UE does not address in any significant fashion why this Court should find the self-insured retention is $2,500, and not $77,500. In light of the explicit language of the Landmark Policy itself, it is unequivocally clear that the parties intended that the self-insured retention for an incident such as the one alleged in the <u>DeVercelly</u> Action would be $77,500. The Policy contains the bolded heading "Misc. Coverages and Limits." Under that heading, two lines are found, the first of which reads: "Fire

---

[22] While the "Other Insurance" clauses have been detailed above, for purposes of illustrating their substantially similar nature, the relevant portions will be restated here. Landmark's clause is as follows: "This insurance is excess over other valid and collectible insurance available to the insured for a loss we cover under this policy." Similarly, UE's policy reads: "this Policy shall be excess over any other valid and collectible primary insurance that applies to an Occurrence covered by this Policy."

[23] <u>See</u> Response To Landmark's Statement Of Material Facts at 5: "Qualified. UE admits that the Landmark Policy is subject to a self-insured retention of $2,500, but denies the Policy reflects any additional self-insured retention of $75,000."

Damage: $1,000,000 Excess of SIR." See Dupre Decl., Ex. C, Landmark Policy.  The immediate

line below it reads: "Additional SIR $75,000 Each Occurrence/75,000 Aggregate."  Id.  The

subsequent line is a bolded heading titled "Self Insured Retention."  Under that heading, one line

is written, which states: "Each Occurrence: $2,500 … Aggregate: None … Defense Inside SIR."

The Court finds that, given the plain language of the Landmark Policy, the Landmark Policy is

subject to both the self-insured retention of $2,500 dollars and the additional $75,000 for a sum

total of $77,500.

While Landmark claims  it has the right to provide a defense prior to the payment of the

self-insured retention, it denies that it has any obligation to defend until the self-insured retention

is satisfied.  Thus, once the self-insured retention of $77,500 has been satisfied, in other words,

once Moving Defendants have paid Landmark the entire self-insured retention, its right to

defend Moving Defendants becomes a duty to defend.

IV.    **CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Moving Defendants'

Motion for summary judgment, and grants in part and denies in part Plaintiff's Cross-Motion for

summary judgment.  Specifically, upon construing the Landmark Policy pursuant to New Jersey

law, the Court finds that Landmark has a concurrent obligation to defend Rider and its

employees.  However, Landmark does not have a duty to defend DiDonato for claims arising out

of alleged hazing, pursuant to the Policy's Hazing Exclusion.  Finally, before Landmark is

required to take over in the defense of Rider and its employees, they must satisfy the $77,500

self-insured retention as set forth in the Landmark Policy.


Dated June 30, 2009                                             /s/ Freda L. Wolfson
                                                                Freda L. Wolfson, U.S.D.J.

34